680 A.2d 634

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. WINSTON ROACH, DEFENDANT-APPELLANT.

Argued February 13, 1996—Decided August 7, 1996.

212

*Joseph S. Murphy* argued the cause for appellant.

*Michael J. Williams,* Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

*Jay L. Wilensky,* Assistant Deputy Public Defender, for amicus curiae, Public Defender (*Susan L. Reisner,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This case stems from the gas station robbery and murder of two people in Newark, New Jersey. Five individuals were charged with these crimes. The evidence of the roles and conduct of the defendants in the commission of the charged crimes was conflict-

ing. Four defendants were eventually tried in separate proceedings by the same prosecutor.

The defendant in this case was convicted by a jury of felony murders, aggravated manslaughters, armed robberies, conspiracy, and possession of weapons for unlawful purposes. He was sentenced to two consecutive life terms with periods of parole ineligibility aggregating sixty years. Another defendant was tried before and sentenced by a different judge. He received concurrent life terms with parole ineligibility of thirty years.

Among the important issues this case presents are: (1) whether a prosecutor's use of conflicting theories in separate criminal proceedings violates the rights of a defendant to a fair trial; and (2) whether the disparity between the sentences of similar codefendants convicted of the same offenses violates the sentencing guidelines for uniformity.

I

The defendant, Winston Roach, was indicted on eleven counts of conspiracy to commit robbery (second degree), armed robbery (first degree), purposeful and knowing murder, felony murder, unlawful possession of handguns without a permit, and possession of weapons for unlawful purposes (second degree). The other individuals indicted for these crimes were Billy Jackson, Lawrence Wright, and Kelvin Oglesby. Gregory Tucker was also indicted but the charges against him were later dismissed.

According to the State, on the evening of May 30, 1991, at approximately 10:15 P.M., Jose Lavoura and Carlos Suarez were preparing to close the Sunoco Gas station where they worked in Newark. At the same time, Tracy Gilliam drove into the station to buy gas and waited in his car for an attendant. He noticed that two African–American men were inside the station talking to two Latino men. About ten minutes later, Gilliam heard gunshots. Frightened, Gilliam immediately left the station. As he drove away, Gilliam "glanced back through his mirror" and saw "two [African–American] individuals running out" with Suarez running

after them. Gilliam was unable to identify the two African–American individuals.

Milton Shackleford and Charles Green also heard the gunshots. Both were in a store across the street from the gas station. After hearing the shots, they went outside and saw Suarez and two African–American men running away. He also recognized co-defendant Lawrence Wright as one of the African–American men. According to Shackleford, the two African–American men got into a yellow and brown Cutlass Supreme automobile car that was parked on the corner of Lyons and Wainwright Streets. Suarez died from gunshot wounds.

When the Newark police arrived sometime between 11:00 and 11:30 P.M., they found Lavoura dead from a gunshot wound. There was $240 in Lavoura's pockets and $52 on top of a small desk. Between $1300 and $1400 was missing from the receipts. There were bullet fragments and live rounds from .22 and .25 caliber weapons in the office. Forensic reports showed that Lavoura died from .22 caliber gunshot wounds and Suarez died from .22 and .25 caliber gunshot wounds. There were no bullet fragments found outside the station office or on the street.

On June 25, 1991, Lawrence Wright surrendered to the Newark police and was arrested. Police identified three other suspects: Winston Roach, Billy Jackson, and Gregory Tucker.

On July 24, 1991, Investigator Louis Carrega of the Essex County Prosecutor's office and Detective Charles Conte of the Newark police questioned defendant. They told defendant that he was a suspect. Defendant was also Mirandized. Defendant denied any knowledge of the murders and refused to make a statement.

On August 8, 1991, Joseph Smith, a prison informant, told police that Wright said Jackson was the "shooter of both individuals."

On August 13, 1991, the police questioned Kelvin Oglesby. Oglesby implicated Wright and Jackson as participants in the robbery and shootings. Oglesby said that he and defendant were

unaware of the robbery and shootings. Oglesby said that Jackson shot defendant after they argued about what had happened.

On August 15, 1991, Jackson was arrested in Bridgeton, New Jersey. Jackson confessed that he and defendant shot both victims. Before his trial, Jackson recanted and alleged that Wright was the sole shooter.

On August 16, 1991, Investigator Carrega and Detective Conte again questioned defendant. They told him that he was "viewed as a suspect in the murders." At that time, he was in police custody on an unrelated offense. He waived his *Miranda* rights.

Defendant confessed that he was involved in the robbery but only as a look-out. Defendant told police that Wright and Jackson entered the gas station, and that Jackson told him that he shot both victims. Defendant also stated that Jackson carried a .22 automatic chrome gun with a clip and that Wright carried a .25 caliber weapon. Defendant gave police a detailed statement. At trial, defendant unsuccessfully moved to suppress the statement.

Defendant elected not to testify and presented no witnesses. Shackleford, Gilliam, and Investigator Carrega testified for the State. Neither Shackleford nor Gilliam was able to identify defendant or to connect him with the crimes. Investigator Carrega testified about his August 16, 1991, interview with defendant and read defendant's entire statement into the record.

The court charged the jury about "both accomplice liability and the theory that the defendant might have been a principal."

Defendant was convicted of all counts except murder. The trial court at sentencing merged all the convictions into the felony murder convictions. As noted, it imposed two consecutive life sentences with a thirty-year parole disqualifier on each term. Defendant's total sentence was life with a sixty-year period of parole ineligibility.

On appeal, defendant raised numerous claims of error. The appellate court affirmed defendant's convictions and sentence. Defendant petitioned for certification, which this Court granted.

142 *N.J.* 573, 667 *A.*2d 190 (1995). The Court granted the motion of the Public Defender for leave to appear as *amicus curiae.*

## II

Defendant contends that the prosecutor falsely and unfairly argued to the jury that defendant was a principal in the commission of the crimes and, further, presented factually inconsistent positions in the separate criminal prosecutions of the other co-defendants. Defendant asserts that the presentation of false arguments tainted the jury's deliberations and, by relying on inconsistent positions in separate criminal proceedings involving the identical crimes and participants, the State engaged in prosecutorial misconduct that requires the reversal of defendant's convictions.

### A.

Defendant contends that the prosecutor's argument in summation to the jury that defendant was the shooter was wholly unsupported by the evidence.

To justify reversal of a criminal conviction, the prosecutor's conduct must "substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). The misconduct must be "so egregious that it deprived defendant of a fair trial." *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987).

Not every instance of misconduct in a prosecutor's summation will require a reversal of a conviction. There must be a palpable impact. *State v. Smith,* 27 *N.J.* 433, 460, 142 *A.*2d 890 (1958). Although prosecutors may suggest legitimate inferences from the record, they may not go beyond the facts before the jury. *See State v. Perry,* 65 *N.J.* 45, 48, 319 *A.*2d 474 (1974); *State v. Farrell,* 61 *N.J.* 99, 103, 293 *A.*2d 176 (1972). *See also State v.*

*Williams,* 113 *N.J.* 393, 451–52, 550 *A.*2d 1172 (1988) (noting that prosecutor's use of extraneous information was deliberate attempt to "highlight victim's virtues in order to inflame the jury").

The prosecutor's summation reasonably suggested that defendant could have been either the lookout or the shooter. The jury could have found defendant guilty as a principal if it discredited defendant's testimony and considered how Shackleford and Gilliam could not clearly say that defendant was only a lookout.

Nothing in the record indicates that false or baseless accusations were made against defendant by the prosecutor. We conclude that the State's argument included reasonable inferences to be drawn from the evidence.

### B.

■ Defendant also alleges prosecutorial misconduct in presenting alternative theories at the trials of his co-defendants. Defendant specifically points out that the State argued that Wright and Jackson were the two shooters at the trials of Wright, Oglesby, and Jackson. The State denies that it presented mutually exclusive, false, or misleading evidence. It contends that the evidence permits two factual scenarios: the shooters were either Jackson and Wright or Jackson and defendant.

This is not a case where the prosecutor destroyed the credibility of one witness to convict one defendant and then used that same witness to convict a co-defendant for the same crime. *See, e.g., Drake v. Kemp,* 762 *F.*2d 1449 (11th Cir.1985), *cert. denied,* 478 *U.S.* 1020, 106 *S.Ct.* 3333, 92 *L.Ed.*2d 738 (1986). Nor is this a case where the prosecutor improperly argued facts that were unsupported by the evidence. *Nichols v. Collins,* 802 *F.Supp.* 66, 75 (S.D.Tex.1992) (holding in case, in which defendant challenged his murder conviction and death sentence on ground that state's conflicting theories in the trial of his accomplice constituted a denial of due process, that state may be "constitutionally estopped from obtaining a fact finding in one trial and seeking and obtaining an inconsistent fact finding in another trial"), *habeas corpus*

*denied sub nom, Nichols v. Scott,* 69 *F.*3d 1255, 1265 & n. 17, 1273–74 (5th Cir.1995), *cert. denied sub nom Nichols v. Johnson,* — *U.S.* ——, 116 *S.Ct.* 2559, 135 *L.Ed.*2d 1076 (1996). Furthermore, the prosecutor did not convict defendant with a factual determination that he had formally disavowed at other trials. *See Jacobs v. Scott,* 31 *F.*3d 1319, 1322–23 (5th Cir.1994) (ruling in capital case that prosecutor's statements at subsequent trial of another defendant that the defendant was not the triggerman, was not in the nature of "newly discovered evidence," even though State presented inconsistent theories), *cert. denied,* — *U.S.* ——; 115 *S.Ct.* 711, 130 *L.Ed.*2d 618 (1995).[1]

A prosecutorial decision to argue facts that are not in evidence or that amount to baseless accusations is impermissible. *State v. Perry, supra,* 65 *N.J.* at 48, 319 *A.*2d 474. The record in this case does not demonstrate that the prosecutor engaged in such unfair or illegal tactics, *see State v. Ramseur, supra,* 106 *N.J.* at 446, 524 *A.*2d 188; made inflammatory remarks, *see State v. Johnson,* 120 *N.J.* 263, 296, 576 *A.*2d 834 (1990); or deliberately made unsupportable arguments to try to mislead the jury, *see State v. Acker,* 265 *N.J.Super.* 351, 357–58, 627 *A.*2d 170 (App. Div.) (noting prosecutor's summation included baseless accusations and was so egregious as to warrant reversal and a new trial), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993).

The prosecutor properly presented different, plausible interpretations of the conflicting evidence. Although the prosecutor argued in the three separate trials of the co-defendants that

---

[1] We note that the standard applicable to this situation may invoke heightened considerations for protection of defendant's rights in the context of a death-penalty prosecution. Justice Stevens, joined by Justice Ginsburg, filed a dissenting opinion to the denial of certiorari in *Jacobs* arguing that:

> For a sovereign state represented by the same lawyer to take flatly inconsistent positions in two different cases—and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence—surely raises a serious question of prosecutorial misconduct

> [*Id.* at ——, 115 *S.Ct.* at 712, 130 *L.Ed.*2d at 619 (Stevens, J., dissenting).]

Jackson and Wright were the shooters, the evidence did not conclusively establish that Jackson and Wright were the actual shooters. The evidence supported the differing inferences about defendant's role in the crimes. As a result, the prosecutor did not ignore his duty to seek justice nor did he pursue a tactic compromising the integrity of the courts in order to obtain a conviction. Within the bounds set by the available inferences to be drawn from the evidence, the prosecutor is entitled to present the strongest case against each defendant provided the State has not compromised that evidence or engaged in representations on which the courts have relied or that have prejudiced the defendant.

The record here indicates that the prosecutor's arguments presented to defendant's jury were inconsistent with the arguments made at the trials of the co-defendants. Nevertheless, the jurors were clearly exposed to evidence that permitted different inferences concerning a basis for defendant's criminal guilt, including versions that were consistent with the prosecutions of the other co-defendants, namely that defendant was or may have been a lookout. Moreover, they were repeatedly instructed to render a verdict based on the evidence and not on the remarks of the attorneys. Further, the prosecutor's presentation of evidence did not prejudice defendant. Questions asked by the jury strongly suggest that defendant's conviction was based on accomplice and not principal liability.[2] Defense counsel acknowledged that point himself at sentencing.[3]

---

[2] The jurors asked whether accomplice liability applied to counts 4 and 5 (purposeful and knowing murder) and whether the defendant would have to be a principal for conviction. On the armed robbery count, the jurors asked "did he have to be holding the gun in the office" for liability. Those questions prompted a recharge from the trial court on accomplice liability, which pointed out that an accomplice may participate in the criminal act with a different intent resulting in a different degree of guilt.

[3] At sentencing, defense counsel stated the following: "In Mr. Roach's case he is not—was not convicted of being the—one of the actual gunmen in this case, he was convicted of being an accomplice—a lookout in this particular case."

We find that the actions by the prosecutor as a whole did not violate fundamental fairness and were not so egregious that reversal of the convictions would be warranted.

### III

Defendant raises several issues involving various trial errors relating to instructions to the jury and several evidentiary rulings that he claims resulted in the improper admission of evidence, including his confession. Defendant further contends that the evidence of his guilt as an accomplice was not competent or adequate to sustain his conviction.

### A.

In characterizing defendant as a shooter, the State relied on the inconsistency between his statement that he was a lookout and the testimony of Shackleford regarding the number of men he saw running from the station. According to the prosecutor, if defendant's statement that he was a lookout is true, Shackleford would have seen him. If the statement is not true, defendant could have been the second African–American man and therefore the second shooter. The evidence supports the State's use of these inferences to posit its alternative theories.

A defendant, moreover, may be found guilty of murder even if jurors cannot agree on whether the defendant is a principal, accomplice, or a co-conspirator. *State v. Brown,* 138 *N.J.* 481, 520–22, 651 *A.*2d 19 (1994). When a defendant may be found guilty either as a principal actor or as an accomplice, the jury should be instructed about both possibilities. *State v. Morales,* 111 *N.J.Super.* 521, 526, 269 *A.*2d 530 (App.Div.1970), *certif. denied,* 57 *N.J.* 433, 273 *A.*2d 60 (1971). Given the reasonable inferences to be drawn from the evidence of both accomplice and principal liability, the trial court properly charged the jury on both theories. *State v. Martin,* 119 *N.J.* 2, 9, 573 *A.*2d 1359 (1990).

We conclude that a reasonable jury could have found beyond a reasonable doubt that defendant was either a shooter or a principal. Therefore, we conclude that the jury was not improperly instructed.

### B.

Defendant and the Public Defender contend that hearsay inferences arising out of the direct examination of Investigator Carrega violated defendant's constitutional right of confrontation.

Carrega testified that only after speaking to several people did he meet with defendant and tell him that he was a suspect in the investigation. Carrega testified that he received information from Joseph Smith, a jailhouse informer, and from co-defendants Oglesby and Jackson on their arrests. Under further questioning by the prosecutor, Carrega then stated that he met again with defendant and advised him that he was a suspect in the case.

It is well-settled that the admission of the statement of a co-defendant at a joint trial that implicates defendant without the right of cross-examination constitutes prejudicial error. *Bruton v. United States*, 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968); *State v. Young*, 46 *N.J.* 152, 215 *A.*2d 352 (1965). Disclosure to the jury, moreover, of inculpatory information supplied by a co-defendant who did not testify deprives a defendant of his constitutional right to confront a witness. *State v. Bankston*, 63 *N.J.* 263, 271, 307 *A.*2d 65 (1973) (noting detective's testimony that arrest of the defendant following his receipt of information from an informant created "inescapable" hearsay inference); *see also State v. Niesbbalski*, 82 *N.J.L.* 177, 179, 83 *A.* 179 (S.Ct.1912) (noting detective's testimony created by "necessary inference" the conclusion that complaint against the defendant was based on information from co-defendants).

Although Carrega did not specifically repeat what any of those named people told him, his testimony by necessary inference implicated defendant. *Compare State v. Bowens*, 219 *N.J.Super.*

290, 299–300, 530 A.2d 338 (App.Div.1987) (noting police officer specifically referred to the defendant and the time of the offense based on hearsay report) *with State v. Long*, 137 *N.J.Super.* 124, 133–34, 348 A.2d 202 (App.Div.1975) (noting officer's testimony that he went to the scene of the arrest because he was told by people at that address about drug dealing), *certif. denied*, 70 *N.J.* 143, 358 A.2d 190 (1976). In *State v. Bankston, supra,* the Court determined that a police officer's testimony that he "approached a suspect or went to the scene of the crime ... upon information received" does not violate the hearsay rule. 63 *N.J.* at 268, 307 A.2d 65. The Court further determined that "when an officer becomes more specific by repeating what some other person told him concerning a crime by the accused," that testimony violates both the hearsay rule and the defendant's Sixth Amendment right of confrontation. *Id.* at 268–69, 307 A.2d 65.

The State contends that because Carrega did not testify that co-defendants had actually accused defendant, no prejudice arose. Despite that contention, it is the "creation of the inference, not the specificity of the statements made," that determines whether the hearsay rule was violated. *State v. Irving*, 114 *N.J.* 427, 555 A.2d 575 (1989). Here, Carrega testified to a number of statements from co-defendants. He also discussed the trail of his investigation that led to the arrests of co-defendants Wright, Oglesby, and Jackson. He twice accused or characterized defendant as a "suspect" based on the information obtained from the co-defendants. That testimony, as it was presented, "irresistibly" implicated defendant. *See State v. Thomas*, 168 *N.J.Super.* 10, 15, 401 A.2d 693 (App.Div.1979) (noting prosecutor's step-by-step questioning of detective's investigation based on interviews with witnesses was contrary to hearsay rule and violated defendant's right to confront the witnesses against him). As the Court found in *State v. Irving*, 114 *N.J.* 427, 445–46, 555 A.2d 575 (1989), the police officer could simply have testified that he questioned defendant "based on information received."

██ Defendant and the Public Defender contend that the evidence prejudiced defendant's right to a fair trial. "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Bankston, supra,* 63 *N.J.* at 273, 307 *A.*2d 65 (citing *Fahy v. Connecticut,* 375 *U.S.* 85, 86–87, 84 *S.Ct.* 229, 230, 11 *L.Ed.*2d 171, 173 (1963)). "The answer to that question turns on whether the error was harmless considering the other evidence of guilt." *State v. Baker,* 228 *N.J.Super.* 135, 140, 549 *A.*2d 62 (App.Div.1988).

In this case, defendant's confession created in itself an inescapable inference that he was a criminal actor, either as an accomplice or, possibly, as a principal. Defendant admitted to being at the crime scene. He admitted to planning the robbery, being a lookout, knowing about the guns, and knowing the details of the shooting. He also stated that he asked co-defendant Jackson "why they did not get the money." The jury could have predicated its findings of guilt upon his statement without any resort to or reliance on the hearsay testimony. Therefore, the error does not require reversal of defendant's conviction.

## C.

██ Defendant contends that his confession should have been suppressed on the grounds that his confession and waiver of *Miranda* rights were involuntary. He specifically argues that police obtained the waiver and confession by deceiving him into believing that they sought his statement only as a witness and not as a defendant, and, therefore, he did not make a knowing, intelligent, and voluntary waiver of his rights.

At the suppression hearing, the trial court found that defendant understood his *Miranda* rights, that he voluntarily waived those rights, and that he voluntarily made his statement. The court expressly noted that defendant may have given his statement to police believing that it was exculpatory and hoping that he would be a witness. The court held that defendant's statement was not the product of deceit or suggestion.

A determination of voluntariness depends on an "evaluation of the totality of all the surrounding circumstances." *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047, 36 *L.Ed.*2d 854, 862 (1973); *State v. Reed,* 133 *N.J.* 237, 256, 258, 627 *A.*2d 630 (1993); *State v. DiFrisco,* 118 *N.J.* 253, 257, 571 *A.*2d 914 (1990); *State v. Starling,* 188 *N.J.Super.* 127, 131, 456 *A.*2d 125 (Law Div.1983), *aff'd,* 207 *N.J.Super.* 79, 504 *A.*2d 18 (App.Div. 1985), *certif. denied,* 103 *N.J.* 481, 511 *A.*2d 658 (1986). The mere fact that promises are made to a defendant does not render the statement involuntary. *State v. Starling, supra,* 188 *N.J.Super.* at 131, 456 *A.*2d 125. It depends on the circumstances of a particular case. *Ibid.* (citing *Brady v. United States,* 397 *U.S.* 742, 748, 90 *S.Ct.* 1463, 1469, 25 *L.Ed.*2d 747, 757 (1970)).

Nothing in the record supports a conclusion that defendant's statement was not the "product of 'an essentially free and unconstrained choice.'" *State v. Pickles,* 46 *N.J.* 542, 577, 218 *A.*2d 609 (1966). This is not a case where a defendant's inculpatory statement was "extracted by basically unfair means." *See, e.g., State v. Miller,* 76 *N.J.* 392, 405, 388 *A.*2d 218 (1978) (finding confession voluntary notwithstanding police officer's appeal to suspect as a friend by telling him he needed medical help, not punishment); *State v. Pickles, supra,* 46 *N.J.* at 577, 218 *A.*2d 609 (finding confession not voluntary when pregnant defendant was "easy prey to interrogative pressure" by being questioned alone after son's funeral). Moreover, his credibility was undermined by clear inconsistencies with other co-defendants' statements. Furthermore, his admissions to the police on July 24, 1991, suggest he was aware that he was a suspect. Also, defendant had extensive experience with the criminal justice system both as a juvenile and as an adult, *see infra* at 229, 680 *A.*2d 644. *See State v. Starling, supra,* 188 *N.J.Super.* at 133, 456 *A.*2d 125 (observing that defendant was not a "babe in the woods.").

The record below establishes that the trial court's determinations of voluntariness and of waiver were amply supported by the record. Reviewing the totality of the circumstances in this case,

we find that defendant's right to a fair trial was not violated because his statement was not obtained by deceit or promises of benefit.

## D.

██ Defendant contends that the trial court committed error by not directing an acquittal at the end of the case. He specifically questions whether a jury could infer that he was a principal.

The trial court identified particular facts that, when taken together, suggest defendant was a shooter based on how he knew the circumstances of the shooting and "perhaps the nature of the injuries that were caused." First, defendant knew Wright, who was one of the two shooters, defendant lived near the gas station, and defendant knew what the getaway car looked like. Second, defendant knew that one victim was shot in the head in the office area and that the other victim was shot while running away. Third, defendant's statement suggested that he knew two different caliber weapons were used and that there were two shooters. Further, defendant knew that some money was not actually taken. The trial court determined that the State's proofs were sufficient to constitute a jury question about whether defendant's confession was trustworthy.

██ Defendant further contends that there was insufficient corroboration of his confession and that the trial court erred in failing to submit an instruction on corroboration.

Defendant has failed to demonstrate that his statement was insufficiently corroborated. This is not a case where the Court must be duly concerned with the danger that a defendant will be convicted "out of his own mouth" of a crime committed by another. *State v. Johnson, supra,* 31 *N.J.* 489, 502, 158 *A.*2d 11 (1960); *see State v. DiFrisco,* 118 *N.J.* 253, 293, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part). Nor is this a case where a defendant's confession is "otherwise deemed unworthy of

belief." *Lego v. Twomey,* 404 *U.S.* 477, 486, 92 *S.Ct.* 619, 625, 30 *L.Ed.*2d 618, 626 (1972).

The entire thrust of the defense was its argument that the statement was untrue. The trial court's instruction clearly advised the jury that it must decide the issues of fact regarding the value of defendant's statement confession. The jury, in weighing the credibility of the statement, must have considered the independent corroborative facts, both direct and circumstantial, that were submitted by the State. *See State v. DiFrisco, supra,* 118 *N.J.* at 274, 571 *A.*2d 914 (noting that issues of fact regarding corroboration of defendant's confession are properly resolved by the jury).

We are satisfied that the evidence and inferences to be drawn from the evidence were sufficient for the jury to determine that the confession was trustworthy. We conclude that the trial court's failure, therefore, specifically to charge the jury that it must find corroboration was not harmful error.

## IV

The trial court sentenced defendant and co-defendant Wright to the same consecutive sentences. A different court sentenced co-defendant Jackson to two concurrent life sentences. Defendant alleges that he and the two other defendants were all found guilty of identical charges, had similar criminal histories,[4] and were

---

[4] Defendant's present offense is his fourth indictable conviction as an adult. *Adult Presentence Report, Uniform Intake Report 1* (1992). Defendant has an extensive arrest history as a juvenile and as an adult for burglary, motor vehicle theft, assault, armed robbery, and CDS offenses. *Ibid.* At the time of his sentencing, defendant also had several charges pending related to violent assaults, terroristic threats, and unlawful weapon offenses. *Ibid.* The trial court also noted that those offenses had occurred within or about thirty days after the offenses in the instant case.

It has been argued that Wright's juvenile record includes seventeen arrests, mostly for theft and robbery. Jackson has an extensive juvenile complaint history yielding four adjudications of delinquency. As an adult, he has seven

assessed the same aggravating and mitigating factors. Moreover, he asserts, both Wright and Jackson were found to be without remorse and were convicted as shooters. He contends that in these circumstances the disparity between these sentences renders his sentence invalid.

An appellate court should disturb the sentence imposed by the trial court only in situations where the sentencing guidelines were not followed, the aggravating and mitigating factors applied by the trial court are not supported by the evidence, or applying the guidelines renders a particular sentence clearly unreasonable. *State v. Roth,* 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984). Only when the facts and law show "such a clear error of judgment that it shocks the judicial conscience" should a sentence be modified on appeal. *Id.* at 363–64, 471 *A.*2d 370.

In sentencing defendant, the trial court conformed to all sentencing guidelines and followed proper sentencing procedures. Further, the trial court's findings of the aggravating and mitigating factors were amply supported by the record. *State v. O'Donnell,* 117 *N.J.* 210, 216, 564 *A.*2d 1202 (1989). Moreover, the trial court gave extensive reasons for its sentencing decision. *State v. Kruse,* 105 *N.J.* 354, 363, 521 *A.*2d 836 (1987). The trial court acknowledged defendant's role as an accomplice, but determined that the conviction based on accomplice liability did not warrant any greater leniency.

The court followed proper procedures and standards in imposing consecutive, not concurrent, sentences. *N.J.S.A.* 2C:44–5a. Consecutive sentences are not an abuse of discretion when the crimes involve multiple victims and separate acts of violence. *See State v. Louis,* 117 *N.J.* 250, 254, 566 *A.*2d 511 (1989) (rejecting consecutive sentencing that was based on cruelty and inhumanity of crime rather than independent nature of victims or

---

arrests and two indictable convictions, including the present offense involving mainly thefts and burglaries; a criminal attempt charge is pending.

violent acts); *State v. Ghertler,* 114 *N.J.* 383, 392, 555 *A.*2d 553 (1989) (affirming consecutive sentencing that was based on independent nature of multiple criminal acts). Defendant's sentences were based on two convictions for felony murder. The court's findings suggest that the deaths of the two victims were separate acts of violence caused by distinct types of conduct. Even if the murders occurred in close sequence, consecutive sentencing is not improper. *State v. Brown, supra,* 138 *N.J.* at 560, 651 *A.*2d 19. The court also did not believe that there should be any difference between the punishments meted out to Jackson or defendant despite the differences in their roles in the crimes or because defendant was an accomplice. *See State v. Rogers,* 124 *N.J.* 113, 115–16, 590 *A.*2d 234 (1991) (ruling that defendant accomplice who supplied the guns and drove getaway car could be sentenced to two consecutive thirty-year mandatory terms for felony murder convictions). Furthermore, although under *State v. Yarbough,* 100 *N.J.* 627, 646, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), a shorter second term should generally be imposed "when consecutive terms are imposed for the same offense," that guideline does not "apply in cases in which sentences [are] mandated by the Code." *State v. Brown, supra,* 138 *N.J.* at 560, 651 *A.*2d 19. Felony murder convictions result in mandated sentences of thirty-years imprisonment. *N.J.S.A.* 2C:11–3b.

We thus conclude that the sentences imposed on defendant conform to all sentencing guidelines and do not reflect any abuse of discretion. The next issue is whether in light of the sentences imposed on the co-defendant the sentences received by defendant may be invalid on grounds of disparity or non-uniformity.

This Court has consistently stressed uniformity as one of the major sentencing goals in the administration of criminal justice. Achieving greater uniformity in sentencing is a firm judicial commitment. "[T]here can be no justice without a predictable degree of uniformity in sentencing." *State v. Hodge,* 95 *N.J.* 369,

379, 471 A.2d 389 (1984). In *State v. Roth, supra,* 95 N.J. 334, 471 A.2d 370, this Court emphasized the importance of uniform and proportionate sentencing in light of the sentencing standards instituted by the Legislature in the Code of Criminal Justice. "The central theme" of our. sentencing jurisprudence is the exercise by courts of "a structured discretion designed to foster less arbitrary and more equal sentences." *Id.* at 345, 471 A.2d 370. The Court struggles continuously to overcome non-uniformity in sentencing: "We must not forget that the driving force behind sentence reform was the tragic disparity in sentences inflicted upon defendants under the old model." *Hodge, supra,* 95 N.J. at 379, 471 A.2d 389 (citation omitted).

Disparity may invalidate an otherwise sound and lawful sentence. *See, e.g., State v. Hicks,* 54 N.J. 390, 392, 255 A.2d 264 (1969) (reducing defendant's sentence to that imposed on codefendant whose participation in the homicide was greater· than defendant's); *State v. Lee,* 235 N.J.Super. 410, 416, 563 A.2d 51 (App.Div.1989) (remanding for a disparity determination involving comparative severity of sentences); *State v. Hubbard, supra,* 176 N.J.Super. 174, 175, 422 A.2d 471 (1980) (stating that where defendant found guilty of murder was sentenced to life imprisonment but co-defendant who was the actual shooter pled *non vult* to murder and received term of eight to ten years, resentencing hearing necessary to determine whether there was a "good cause" basis for disparity).

We acknowledge that "[a] sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter." *Hicks, supra,* 54 N.J. at 391, 255 A.2d 264. However, although the sentence imposed on defendant falls within the statutory limits mandated for the offense, "there is an obvious sense of unfairness in having disparate punishments for equally culpable perpetrators." *State v. Hubbard,* 176 N.J.Super. 174, 175, 422 A.2d 471 (Resentencing Panel 1980) (citing *State v. Whitehead,* 159 N.J.Super. 433, 388 A.2d 280 (Law Div.1978), *aff'd,* 80 N.J. 343, 403 A.2d 884 (1979)). The purpose of the guidelines is to promote fairness and public confidence in the "even handed

justice of our system." *Hicks, supra,* 54 *N.J.* at 391, 255 *A.*2d 264. The question therefore is whether the disparity is justifiable or unjustifiable.

The defendant's sentence would appear to be a "paradigmatic example of non-uniformity." *State v. Pillot,* 115 *N.J.* 558, 576, 560 *A.*2d 634 (1989). The record strongly indicates dissimilar sentences imposed on similar defendants. Moreover, the disparity between the sentences is not minimal—it is huge: thirty additional years in prison. We, therefore, conclude that there should be a remand to determine whether that disparity is justifiable.

The record does not present an acceptable justification of defendant's sentence in light of the sentence imposed on his co-defendant. The trial court was cognizant of the sentences imposed on co-defendant Jackson and defendant but felt that it could disregard the sentences imposed on the co-defendant. The court explained that it had the discretion to sentence defendant more severely than the co-defendant because it had "lateral jurisdiction" and considered the co-defendant to have received "a very lenient sentence."

The court's explanation implies that it considered defendant and the co-defendant to be "similar" but that they did not deserve "similar sentences." A disparate sentence based solely on those reasons is not justifiable. In such circumstances, we hold that the sentencing court must exercise a broader discretion to obviate excessive disparity. The trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria. The court should then inquire into the basis of the sentences imposed on the other defendant. It should further consider the length, terms, and conditions of the sentence imposed on the co-defendant. If the co-defendant is sufficiently similar, the court must give the sentence imposed on the co-defendant substantive weight when sentencing the defendant in order to avoid excessive disparity. Sentencing based on such added considerations will accommo-

date the basic discretion of a sentencing court to impose a just sentence on the individual defendant in accordance with the sentencing guidelines while fulfilling the court's responsibility to achieve uniform sentencing when that is possible.

We acknowledge the view expressed by the dissent that a trial court's sentencing discretion is bounded only by the standards set forth in the Code. *Post* at 237, 680 *A*.2d at 648. Clearly, the genuine concerns over sentencing disparity are addressed by enlightened judges consistently applying the Code's standardized sentencing principles and procedures. Nevertheless, we recognize that some disparity in sentencing is inevitable in the administration of criminal justice. Realistically, sentencing cannot be monolithic when individual judges, no matter how competent and conscientious, impose sentences on individual defendants arising from the commission of separate crimes. If, however, it is feasible to avoid or reduce disparity in circumstances such as presented in this case through the trial and/or sentencing of similar defendants by the same judge, that should be undertaken. *See, e.g., State v. Pillot, supra,* 115 *N.J.* at 576, 560 *A*.2d 634. If those procedural avenues are not available, then sentencing judges should take into account and give substantive weight to the sentences imposed on similar co-defendants. The overarching goals of uniformity demand that reasonable measures be undertaken to achieve that end.

## VII

We affirm in part and reverse in part.

COLEMAN, J., concurring in part and dissenting in part.

I dissent from the majority's conclusion that there should be a remand to determine whether Roach's sentence is unjustifiably disparate when compared with that of co-defendant Jackson. *Ante* at 233, 680 *A*.2d at 646.

I begin with the recognition that "[t]he paramount goal of sentencing reform [under the Code] was greater uniformity." *State v. Roth,* 95 *N.J.* 334, 369, 471 *A.*2d 370 (1984).

*State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), sought to make sentencing uniform by requiring that the aggregate custodial sentence imposed at one time for multiple offenses should not "exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses." *Id.* at 644, 498 *A.*2d 1239. *Yarbough* further instructs that "there can be no free crimes in a system for which the punishment shall fit the crime." *Id.* at 643, 498 *A.*2d 1239. Although the *Yarbough* outer limit rule on consecutive sentences was superseded by *L.* 1993, *c.* 223, § 1, effective August 5, 1993, the majority maintains that Roach's consecutive life terms with sixty years of parole ineligibility do not violate the Code or any sentencing guidelines. The effect of concurrent sentences in this case would be to give defendant a free murder, the essence of which was condemned by both this Court in *Yarbough* and the Legislature.

The thrust of defendant's argument is that his sentence is more severe than that of Jackson. When two or more codefendants, such as Roach and Jackson, have engaged in substantially similar criminal conduct but are sentenced separately by different judges, the sentence of one defendant that otherwise adheres to the Code and sentencing guidelines, as has occurred here, does not become excessive or erroneous merely because the co-defendant's sentence is lighter. *State v. Tyson,* 43 *N.J.* 411, 417, 204 *A.*2d 864 (1964), *cert. denied,* 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965); *State v. Brunetti,* 114 *N.J.Super.* 57, 62, 274 *A.*2d 830 (App.Div.), *certif. denied,* 58 *N.J.* 340, 277 *A.*2d 397 (1971).

When disparity of sentence is alleged, the scope of appellate review is identical to that applied when excessiveness of sentence is asserted. *State v. Tango,* 287 *N.J.Super.* 416, 422, 671 *A.*2d 186 (App.Div.), *certif. denied,* 144 *N.J.* 585, 677 *A.*2d 758 (1996); *State*

*v. Lee*, 235 *N.J.Super.* 410, 414, 563 *A.*2d 51 (1989). The test "is not whether a reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is rather whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." *State v. Ghertler*, 114 *N.J.* 383, 388, 555 *A.*2d 553 (1989). I believe the majority has violated that standard of review.

That Roach and Jackson were not sentenced by the same judge is not a sufficient basis for declining to adhere to the proper standard of review. I agree that all defendants in a single indictment, or a series of indictments relating to a specific criminal episode, should be sentenced by the same judge. I disagree, however, that a reviewing court in the name of correcting sentence disparity should reduce one co-defendant's sentence, though that sentence complied with all appropriate sentencing guidelines, to make it consistent with another co-defendant's lesser sentence, which the trial court believes was erroneously imposed. My review of the record convinces me that the judge who sentenced defendant was correct when she concluded that Jackson's sentence was too lenient and perhaps the result of a mistake that should not be compounded. In view of that sentencing record, there is nothing more the trial court could have been expected to do; it had very little discretion.

The judges in the present case were limited with respect to the sentence they could impose; their only options were either a concurrent or a consecutive term on the second felony murder. The statutory minimum sentence for felony murder is thirty years without parole eligibility. *N.J.S.A.* 2C:11–3b. Although the maximum sentence under that statute can range anywhere from thirty years to life, a thirty-year term of parole ineligibility under *N.J.S.A.* 2C:11–3b is required. Further, a judge may not impose partially concurrent and partially consecutive sentences for two felony murders. *State v. Rogers*, 124 *N.J.* 113, 118–19, 590 *A.*2d 234 (1991). As noted previously, a concurrent term means a free murder. Consequently, a court is constrained in a double felony

murder case to a choice of either thirty or sixty years of real time. *Id.* at 120, 590 *A.*2d 234.

The sentencing judge explained why a free murder was inappropriate. Among those reasons was the fact that Lavoura was shot inside the office almost immediately. Suarez was shot thereafter in the back by two guns while he was running for his life. Those facts suggest that Lavoura was killed inside the office to compel Suarez to give up the money, and Suarez was shot outside of the office to prevent his escape. Under those circumstances, each of the murders can be viewed as virtually independent of one other, occurring at different times and different places. This Court has acknowledged that even when murders occur in close sequence, consecutive sentences are not improper. *State v. Brown,* 138 *N.J.* 481, 560, 651 *A.*2d 19 (1994).

Statistics compiled by the Administrative Office of the Courts reveal that in multiple murder and multiple felony murder cases, defendants are usually sentenced to consecutive rather than concurrent terms. Thirteen cases were studied, and of the twelve in which defendants were tried, eleven were sentenced to consecutive terms. Although the sampling was not extensive, the results comport with my own judicial experience as well.

The issue of sentence disparity under the Code has existed since the Code has been in effect. *See State v. Hubbard,* 176 *N.J.Super.* 174, 179, 422 *A.*2d 471 (Resen.P.1980) (Coleman, J., dissenting) (stating that a sentence must be excessive before reaching disparity issue). In *Hubbard,* I explained that unjustifiable disparity results from "the sentencing judge abusing his [or her] discretion or depriving a defendant of his [or her] constitutional rights. . . . A justifiable disparity may result from the sentencing judge giving proper consideration to the law . . . and all other proper guidelines for sentencing." *Id.* at 185, 422 *A.*2d 471. I adhere to the view that "a sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter." *State v. Hicks,* 54 *N.J.* 390, 391, 255 *A.*2d 264 (1969) (citations omitted). Because I agree with the majority that defendant's

sentence is not excessive, I find no basis to request that the trial court decide whether unjustifiable disparity exists. I find that the sentences are not unjustifiably disparate as a matter of law because Roach's sentence is not excessive. The remand essentially directs the trial court to undertake the impossible task of proving a negative. *See Williams v. Topps Appliance City*, 239 *N.J.Super.* 528, 532, 571 *A.*2d 1311 (App.Div.1989) (noting that the law rarely imposes upon a litigant the burden of proving a negative).

Even where unjustifiable disparity is found to exist, the better way to correct it is through the Court's supervisory power, rather than its adjudicatory power, on a case-by-case basis. We recently reaffirmed that position, providing that "[t]he issue of sentence disparity is most appropriately addressed on a comprehensive basis rather than considered and resolved in the narrow context and under the procedural constraints of an adversarial proceeding." *State v. Gerns*, 145 *N.J.* 216, 232, 678 *A.*2d 634, 642 (1996). Thus this is the type of case that is better handled on an administrative level to avoid the problems that occur when multiple judges sentence multiple defendants for a single criminal transaction.

I concur in the Court's decision to affirm defendant's convictions, but dissent from the Court's decision to remand for reconsideration of the sentence.

Justice GARIBALDI joins in this opinion.

GARIBALDI and COLEMAN, JJ., concurring in part and dissenting in part.

*For affirmance in part and reversal in part*—Justices HANDLER, POLLOCK, O'HERN and STEIN—4.